UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PHYLLIS WRIGHT, Derivatively on Behalf of MACQUARIE INFRASTRUCTURE CORPORATION,<br><br>                              Plaintiff,<br><br>         v.<br><br>LIAM STEWART, JAY A. DAVIS, RICHARD D. COURTNEY, MARTIN STANLEY, NORMAN H. BROWN, JR., GEORGE W. CARMANY, III, H.E. LENTZ, OUMA SANANIKONE, RONALD KIRK, JAMES HOOKE, and WILLIAM H. WEBB,<br><br>                              Defendants,<br><br>      -and-<br><br>MACQUARIE INFRASTRUCTURE CORPORATION, a Delaware corporation,<br><br>                  Nominal Defendant. | Case No.<br><br><br>VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR VIOLATION OF SECURITIES LAW, BREACH OF FICUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT<br><br><br><br><br><br><br><br><br><br><br><br><br><br>DEMAND FOR JURY TRIAL |

Plaintiff, by her attorneys, submits this Verified Stockholder Derivative Complaint for Violations of Securities Law, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment.  Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff, which are based on personal knowledge.  This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought by plaintiff on behalf of nominal defendant Macquarie Infrastructure Corporation ("Macquarie" or "MIC" or the "Company") against certain of its officers and directors for breaches of fiduciary duties and violations of law. These wrongs resulted in billions of dollars in damages to Macquarie's reputation, goodwill, and standing in the business community.  Moreover, these actions have exposed Macquarie to hundreds of millions of dollars in potential liability for violations of state and federal law.

2.      Macquarie owns and operates a portfolio of infrastructure businesses with the stated aim of producing "growth in the amount of cash generated by our businesses and growth in our stockholder dividend" using a contract revenue-based business model.  The Company's leading revenue producer is its International-Matex Tank Terminals ("IMTT") segment.

3.      Through its IMTT segment, the Company services several third-party contracts to store bulk liquids in terminals in the U.S. and Canada.  In addition to renting its storage tanks, the Company provides dock and intra-modal transportation access and ancillary services such as product transfer, heating, blending, and packaging.  IMTT stores or handles refined petroleum

products, including Number 6 fuel oil,[1] as well as various commodity and specialty chemicals, renewable fuels, and vegetable and animal oils.  What the Company stores in its terminals is dependent on external market factors such as the underlying demand for these liquids, including the level of local and regional consumption.

4.    Throughout 2016 and 2017, the IMTT segment grew to be one of Macquarie's most significant revenue and income producers, providing at least a third of its revenue and more than half of its income during those years.  Throughout this time, the Individual Defendants (as defined herein) repeatedly and brazenly touted this impressive growth and assured the market that IMTT was experiencing a "very strong" performance with "very high" and "stable" utilization rates.[2]  Moreover, the Individual Defendants assured investors that the IMTT segment was not vulnerable to shifts in commodity consumption or underlying demand in the market for refined petroleum products.  Instead, the Individual Defendants caused or allowed the Company to only report the overall IMTT utilization rates which appeared promising, but did not reveal the level of exposure to demand declines in any one commodity.  Certain Company executives also attributed any dip in storage utilization as routine maintenance of the Company's tanks, including cleaning and inspection.

5.    These representations were grossly inaccurate.   In fact, IMTT had become dependent on contracts to store Number 6 fuel oil, exposing the Company to extreme risk in the underlying market for this commodity.  As the Individual Defendants and others in the industry

---

[1] Number 6 fuel oil is a dense, viscous residual fuel oil produced by blending heavy residual oils with lighter oil and used in power generation and space heating.  It has a high sulfur content, making the oil subject to various governmental regulations.

[2] The term "utilization rates" refers to the percentage of the Company's tanks that were under lease and producing revenue during a given period.

were well aware, consumption of Number 6 fuel oil that IMTT had been storing, was in steep decline.  Consequently, the Company revealed in a February 21, 2018 press release that IMTT was losing several vital contracts to lease its terminals, as its customers no longer required the segment's services.  In response, the Company slashed its long-touted consistent dividend to repurpose IMTT's tanks as its customers moved away from heavy residual fuel oils, requiring tens of millions of dollars in capital expenditures.

6.       In addition, defendants Martin Stanley ("Stanley"), Norman H. Brown, Jr. ("Brown"), George W. Carmany, III ("Carmany"), H.E. Lentz ("Lentz"), Ouma Sananikone ("Sananikone"), and William H. Webb ("Webb"), negligently made false and misleading statements in the Company's 2016 Proxy Statement on Form DEF 14A filed with the SEC (the "2016 Proxy").  The 2016 Proxy was filed ahead of the Company's Annual Shareholders Meeting.  The 2016 Proxy included votes to approve performance metrics as part of an equity incentive plan targeting Macquarie employees, including top executives.  In connection with these efforts, the above noted defendants, as members of the Board of Directors (the "Board") misleadingly stated that the equity incentive plan was used "to attract, retain and motivate employees (including prospective employees), consultants and others who may perform services for the Company or its subsidiaries, to compensate them for their contributions to our long-term growth and profits and to encourage them to acquire a proprietary interest in the success of the Company."  In reality, Macquarie executives provided deficient management of the Company's IMTT operations and dividend policy to maximize their equity awards, to the detriment of the Company's reputation.

7.       In the wake of these disclosures, Macquarie's stock plunged more than 41%, or $26.21 per share on February 22, 2018, to close at $37.41 per share, compared to the previous

trading day's closing of $63.62 per share, erasing more than $2.2 billion in market capitalization in a single day.

8.      Further, as a direct result of this unlawful course of conduct, Macquarie is now the subject of two federal securities class action lawsuits filed in the United States District Court for Southern District of New York on behalf of investors who purchased Macquarie's shares (the "Securities Class Actions").  The two Securities Class Actions bring claims against Macquarie and certain of the Individual Defendants in connection with the Company's improper statements, including causes of action under sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

9.      Plaintiff brings this action against the Individual Defendants to repair the harm that they caused with their faithless actions.

## JURISDICTION AND VENUE

10.      Pursuant to 28 U.S.C. §1331 and section 27 of the Exchange Act, this Court has jurisdiction over the claims asserted herein for violations of section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.  This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. §1367.

11.      This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

12.      Venue is proper in this Court in accordance with section 27 of the Exchange Act and 28 U.S.C. §1331.  Macquarie is headquartered in this District.  As state courts of Delaware

lack subject matter jurisdiction in this case, given the exclusive jurisdiction vested in the federal courts over the federal claims asserted herein, the sole and exclusive forum for certain legal actions involving the Company, including those for breach of fiduciary duty, shall be the U.S. District Court for the Southern District of New York.  Further, venue is proper under 28 U.S.C. §1391(a) because Macquarie maintains offices within this District, a substantial portion of the transactions and wrongs complained of herein occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

13.     Plaintiff Phyllis Wright was a stockholder of Macquarie at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Macquarie stockholder.

**Nominal Defendant**

14.     Nominal Defendant Macquarie is a Delaware Corporation with principal executive offices located at 125 West 55th Street, New York, New York.  Macquarie owns, operates, and invests in infrastructure businesses.  These businesses are organized into four segments: IMTT, Atlantic Aviation, Contracted Power, and MIC Hawaii.  Macquarie is externally managed by a subsidiary of Macquarie Group Limited ("Macquarie Group"), Macquarie Infrastructure Management (USA) Inc., pursuant to the terms of a Management Services Agreement.  As of December 31, 2017, the Company's consolidated businesses employed approximately 3,800 people.

**Defendants**

15. Defendant Liam Stewart ("Stewart") is Macquarie's Chief Financial Officer ("CFO") and has been since June 2015. Defendant Stewart was also the asset director for the Company's Atlantic Aviation business from April 2014 to at least June 2015. Defendant Stewart is named as a defendant in the aforementioned two related securities class action complaints, pending consolidation, that allege he violated sections 10(b) and 20(a) of the Exchange Act. Defendant Stewart knowingly, recklessly, or with gross negligence made improper statements in Macquarie's press releases and public filing concerning: (i) IMTT's operational performance and tank utilization; (ii) the risks associated with demand for storage of heavy residual fuel oils in the IMTT segment; and (iii) the Company's need to repurpose its IMTT storage tanks as a result of a decline in demand, requiring significant capital expenditure affecting the Company's ability to pay dividends as warranted. Macquarie paid defendant Stewart the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | All Other Compensation | Total |
|------|--------|-------|--------------|------------------------|-------|
| 2017 | $280,000 | $581,614 | $124,911 | $31,828 | $1,018,353 |
| 2016 | $252,500 | $341,877 | $195,532 | $22,037 | $811,946 |

16. Defendant Jay A. Davis ("Davis") is Macquarie's Vice President and has been since March 2008, and Head of Investor Relations and has been since May 2005. Defendant Davis is also named as a defendant in the two related securities class action complaints, pending consolidation, that allege he violated sections 10(b) and 20(a) of the Exchange Act. Defendant Davis knowingly, recklessly, or with gross negligence made improper statements in Macquarie's press releases and public filing concerning: (i) IMTT's operational performance and tank utilization; (ii) the risks associated with demand for storage of heavy residual fuel oils in the IMTT segment; and (iii) the Company's need to repurpose its IMTT storage tanks as a result of a

decline in demand, requiring significant capital expenditure affecting the Company's ability to pay dividends as warranted.

17.     Defendant Richard D. Courtney ("Courtney") is IMTT's Chief Executive Officer ("CEO") and has been since February 2015.  Defendant Courtney has also served in various positions at IMTT since 1982.  Defendant Courtney is named as a defendant in the two related securities class action complaints, pending consolidation, that allege he violated Sections 10(b) and 20(a) of the Exchange Act.  Defendant Courtney knowingly, recklessly, or with gross negligence made improper statements in Macquarie's press releases and public filing concerning: (i) IMTT's operational performance and tank utilization; (ii) the risks associated with demand for storage of heavy residual fuel oils in the IMTT segment; and (iii) the Company's need to repurpose its IMTT storage tanks as a result of a decline in demand, requiring significant capital expenditure affecting the Company's ability to pay dividends as warranted.

18.     Defendant Stanley is Macquarie's Chairman of the Board and a director, and has been since July 2013.  Defendant Stanley is also the Global Head of Macquarie Infrastructure and Real Assets Division and has been since 2010.  Defendant Stanley was also an Alternate Chairman of Macquarie from April 2011 to July 2013.  Defendant Stanley knowingly or recklessly made improper statements in Macquarie's press releases and public filing concerning: (i) IMTT's operational performance and tank utilization; (ii) the risks associated with demand for storage of heavy residual fuel oils in the IMTT segment; and (iii) the Company's need to repurpose its IMTT storage tanks as a result of a decline in demand, requiring significant capital expenditure affecting the Company's ability to pay dividends as warranted.  Defendant Stanley also negligently made materially misleading statements in the Company's 2016 Proxy.

19.     Defendant Brown is Macquarie's Lead Independent Director and has been since October 2016 and a director and has been since December 2004.  Defendant Brown has served as the Chairman of Macquarie's Audit Committee from at least April 2015 to at least March 2018. Defendant Brown knowingly or recklessly made improper statements in Macquarie's press releases and public filing concerning: (i) IMTT's operational performance and tank utilization; (ii) the risks associated with demand for storage of heavy residual fuel oils in the IMTT segment; and (iii) the Company's need to repurpose its IMTT storage tanks as a result of a decline in demand, requiring significant capital expenditure affecting the Company's ability to pay dividends as warranted.  Defendant Brown also negligently made materially misleading statements in the Company's 2016 Proxy.  Macquarie paid defendant Brown the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2017 | $116,500 | $145,865 | $262,365 |
| 2016 | $108,500 | $150,613 | $259,113 |

20.     Defendant Carmany is a Macquarie director and has been since December 2004. Defendant Carmany has served as a member of Macquarie's Audit Committee from at least April 2015 to at least March 2018.  Defendant Carmany knowingly or recklessly made improper statements in Macquarie's press releases and public filing concerning: (i) IMTT's operational performance and tank utilization; (ii) the risks associated with demand for storage of heavy residual fuel oils in the IMTT segment; and (iii) the Company's need to repurpose its IMTT storage tanks as a result of a decline in demand, requiring significant capital expenditure affecting the Company's ability to pay dividends as warranted.  Defendant Carmany also negligently made materially misleading statements in the Company's 2016 Proxy.  Macquarie paid defendant Carmany the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2017 | $99,000 | $145,865 | $244,865 |
| 2016 | $90,000 | $150,613 | $240,613 |

21.     Defendant Lentz is a Macquarie director and has been since August 2011. Defendant Lentz has served as a member of Macquarie's Audit Committee from at least April 2015 to at least March 2018.   Defendant Lentz knowingly or recklessly made improper statements in Macquarie's press releases and public filing concerning: (i) IMTT's operational performance and tank utilization; (ii) the risks associated with demand for storage of heavy residual fuel oils in the IMTT segment; and (iii) the Company's need to repurpose its IMTT storage tanks as a result of a decline in demand, requiring significant capital expenditure affecting the Company's ability to pay dividends as warranted.   Defendant Lentz also negligently made materially misleading statements in the Company's 2016 Proxy.   Macquarie paid defendant Lentz the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2017 | $92,000 | $145,865 | $237,865 |
| 2016 | $90,500 | $150,613 | $241,113 |

22.     Defendant Sananikone is a Macquarie director and has been since February 2013. Defendant Sananikone has served as a member of Macquarie's Audit Committee from at least April 2015 to at least March 2018.   Defendant Sananikone knowingly or recklessly made improper statements in Macquarie's press releases and public filings concerning: (i) IMTT's operational performance and tank utilization; (ii) the risks associated with demand for storage of heavy residual fuel oils in the IMTT segment; and (iii) the Company's need to repurpose its IMTT storage tanks as a result of a decline in demand, requiring significant capital expenditure affecting the Company's ability to pay dividends as warranted.   Defendant Sananikone also

negligently made materially misleading statements in the Company's 2016 Proxy.  Macquarie

paid defendant Sananikone the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2017 | $99,000 | $145,865 | $244,865 |
| 2016 | $93,000 | $150,613 | $243,613 |

23.     Defendant Ronald Kirk ("Kirk") is a Macquarie director and has been since

November 2016.  Defendant Kirk has served as a member of Macquarie's Audit Committee from

at least March 2017 to at least March 2018.  Defendant Kirk knowingly or recklessly made

improper statements in Macquarie's press releases and public filing concerning: (i) IMTT's

operational performance and tank utilization; (ii) the risks associated with demand for storage of

heavy residual fuel oils in the IMTT segment; and (iii) the Company's need to repurpose its

IMTT storage tanks as a result of a decline in demand, requiring significant capital expenditure

affecting the Company's ability to pay dividends as warranted.  Macquarie paid defendant Kirk

the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2017 | $90,000 | $145,865 | $235,865 |
| 2016 | $10,834 | $82,798 | $93,632 |

24.     Defendant James Hooke ("Hooke") is a Macquarie director and has been since

September 2017, and CEO of Atlas Arteria Limited, an Australian company also externally

managed by a subsidiary of Macquarie Group, and has been since February 2018.  Defendant

Hooke was also CEO of Macquarie from May 2009 to December 2017.  Defendant Hooke is

named as a defendant in the two related securities class action complaints, pending

consolidation, that allege he violated sections 10(b) and 20(a) of the Exchange Act.  Defendant

Hooke knowingly or recklessly made improper statements in Macquarie's press releases and

public filing concerning: (i) IMTT's operational performance and tank utilization; (ii) the risks associated with demand for storage of heavy residual fuel oils in the IMTT segment; and (iii) the Company's need to repurpose its IMTT storage tanks as a result of a decline in demand, requiring significant capital expenditure affecting the Company's ability to pay dividends as warranted. Macquarie paid defendant Hooke the following compensation as a director:

| Year | Salary | Bonus | Stock Awards | All Other Compensation | Total |
|------|--------|-------|--------------|------------------------|-------|
| 2017 | $400,000 | $4,100,000 | $422,167 | $212,050 | $5,134,217 |
| 2016 | $400,000 | $5,500,000 | $1,004,528 | $178,641 | $7,083,169 |

25.     Defendant Webb was Macquarie's Lead Independent Director from at least April 2010 to September 2016, and a director from December 2004 to September 2016.  Defendant Webb served as a member of Macquarie's Audit Committee from at least April 2015 to September 2016.  Defendant Webb also negligently made materially misleading statements in the Company's 2016 Proxy.   Defendant Webb knowingly or recklessly made improper statements in Macquarie's press releases and public filing concerning: (i) IMTT's operational performance and tank utilization; (ii) the risks associated with demand for storage of heavy residual fuel oils in the IMTT segment; and (iii) the Company's need to repurpose its IMTT storage tanks as a result of a decline in demand, requiring significant capital expenditure affecting the Company's ability to pay dividends as warranted.

26.     The defendants identified in ¶¶15-17, and 24 are referred to herein as the "Officer Defendants."   The defendants identified in ¶¶18-25 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶19-23, and 25 are referred to herein as the "Audit Committee Defendants."  Collectively, the defendants identified in ¶¶15-25 are referred to herein as the "Individual Defendants."

## <u>DUTIES OF THE INDIVIDUAL DEFENDANTS</u>

**Fiduciary Duties**

27.     By reason of their positions as officers and directors of Macquarie, each of the Individual Defendants owed and owe Macquarie and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Macquarie and not in furtherance of their personal interest or benefit.

28.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of Macquarie, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with Macquarie, each of the Individual Defendants had knowledge of material, nonpublic information regarding the Company.

29.     To discharge their duties, the officers and directors of Macquarie were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of Macquarie.  By virtue of such duties, the officers and directors of Macquarie were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations;

(b)     ensure that the Company complied with its legal obligations and requirements – including requirements involving the filing of accurate financial and operational information with the SEC;

(c)     conduct the affairs of Macquarie in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting Macquarie's assets, and to maximize the value of Macquarie's stock;

(d)     remain informed as to how Macquarie conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make a reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

(e)     truthfully and accurately guide investors and analysts as to the business operations of the Company at any given time.

**Additional Duties of the Audit Committee Defendants**

30.     In addition to these duties, the Audit Committee Defendants, defendants Brown, Carmany, Kirk, Lentz, Sananikone, and Webb, owed specific duties to Macquarie to assist the Board in overseeing the Company's financial reporting processes.  Under the Audit Committee Charter, the Audit Committee Defendants are responsible for "assisting the Board of the Company in its oversight of the integrity of the Company's financial statements ... and the Company's compliance with legal and regulatory requirements."  Moreover, the Audit Committee's Charter specifically tasks the Audit Committee with reviewing the Company's financial disclosure documents and significant proposed changes in financial statements.  The Audit Committee must also "review the Company's annual audited financial statements and quarterly financial statements with management ... including the Company's disclosures under 'Management's Discussion and Analysis of Financial Condition and Results of Operations,' before the filing of the Company's reports with the SEC."

**Macquarie's Code of Business Conduct**

31.     The Company has adopted a Code of Business Conduct (the "Code"), which applies to all of the directors, officers, and employees of the Company.  The stated purpose of the Code is to, among other things, "act with integrity, keep promises, comply with applicable laws, and raise concerns when things do not seem right."   In particular, the Code provides that employees and Board members must (i) "[p]rovide full, fair, accurate, timely and understandable information for use in MIC's public communications, reports and filings with regulatory agencies[;]" and (ii) "[n]ever make any deletions or alterations to documents, registrations, records or systems for the purpose of inducing MIC employees or third parties to have an erroneous or partial understanding of any subject based on these documents, registrations, records and systems."

**Breaches of Duties**

32.     The conduct of the Individual Defendants complained of herein involves knowing and culpable violations of their obligations as officers and directors of Macquarie, the absence of good faith on their part, and a reckless disregard for their duties to Macquarie that the Individual Defendants were aware, or reckless in not being aware, posed a risk of serious injury to Macquarie.

33.     The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, Macquarie to make improper statements to the public and the Company's stockholders, improper practices that wasted Macquarie's assets, and caused Macquarie to incur substantial damage.

34.     The Audit Committee members had a duty to review the Company's regulatory filings.  The Audit Committee Defendants breached their duty of loyalty and good faith by

approving the improper statements detailed herein and failing to properly oversee Macquarie's public statements.

35.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of Macquarie, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage Macquarie has already incurred, Macquarie has expended, and will continue to expend, significant sums of money.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

36.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct alleged herein as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

37.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) conceal harmful information relating to the Company's IMTT segment and its operations, which rendered statements in the Company's SEC filings and public announcements improper; (ii) deceive the investing public, including stockholders of Macquarie, regarding the Individual Defendants' management of Macquarie's operations; and (iii) enhance the Individual Defendants' executive and directorial positions at Macquarie and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.  In furtherance of this plan, conspiracy,

and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

38.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused Macquarie to issue improper financial statements.

39.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and (ii) to conceal adverse information concerning Macquarie's operations, financial condition, and future business prospects.

40.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct, by causing Macquarie to purposefully or recklessly release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

41.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## BACKGROUND OF THE COMPANY'S IMTT SEGMENT

42.     Macquarie owns, operates, and invests in a diversified group of infrastructure and infrastructure-like businesses in the United States.  The Company operates in several segments, including IMTT, a business providing bulk liquid terminalling to third parties at seventeen terminals in the U.S. and two in Canada.  Bulk liquid terminals provide logistics services to vertically integrated petroleum product producers and refiners, chemical manufacturers, food processors, and commodity traders.

43.     The Company operates one of the larger independent bulk liquid services providers in the U.S., based on capacity.  According to the Company, IMTT primarily handles refined petroleum products, various commodity and specialty chemicals, renewable fuels and vegetable and tropical oils.  Number 6 fuel oil is among the residual fuel oils the Company stores, which the U.S. Energy Information Administration ("USEIA") defines as the remnants of distillate fuel oils and lighter hydrocarbons from refinery operations.  Number 6 fuel oil includes Bunker C fuel oil and is used for the production of electric power, space heating, vessel bunkering, and various industrial purposes.

44.     The Company receives revenues in the IMTT segment through contracts with customers on an availability basis to provide tank capacity, loading and unloading access, and pipeline and trans-loading capacity.  Customers also pay additional fees for ancillary services such as heating and blending.

45.     In 2016 and 2017, the Company's IMTT segment provided a significant portion of the Company's overall revenue and net income as a percentage.  For example, in 2016, revenue associated with IMTT accounted for more than 32% of the Company's total revenue, with $532.4 million in revenue for IMTT.  More than half of the Company's net income that year came from

IMTT, or almost 54%, producing $83 million.  In 2017, the Company reported that IMTT provided more than 30% of its revenue for the year at $549.4 million.  IMTT's net income of $363 million for 2017 provided approximately 80% of the Company's total net income.  Due to the significant impact IMTT had on the Company's financial results, the Individual Defendants repeatedly touted IMTT's utilization rates, a measure of what percentage of the Company's storage tanks were under lease with customers at any given period.  The following table demonstrates the significant role the IMTT segment played in the Company's overall financial stability:

| Fiscal Period | FY 2017 | FY 2016 |
|---|---|---|
| | | |
| MIC Total Revenue | $1,814,713,000 | $1,651,731,000 |
| MIC Total Net Income (Loss) | $456,112,000 | $154,869,000 |
| MIC Total Reportable Segments Net Income (Loss) | $534,043,000 | $192,517,000 |
| | | |
| IMTT Revenue | $549,422,000 | $532,472,000 |
| IMTT Net Income (Loss) | $363,049,000 | $83,142,000 |
| | | |
| IMTT Revenue as a % of MIC Total Revenue | 30.28% | 32.24% |
| IMTT Net Income (Loss) as a % of MIC Total Net Income (Loss) | 79.60% | 53.69% |

46.    Given the substantial role that the IMTT segment played in meeting the Company's financial metrics, Company executives and the Board were or should have been aware of shifts in demand for the commodities that IMTT stores.  For years, the demand for residual fuel oils, including the Number 6 fuel oil the Company stored, was on a considerable and persistent decline.

47.    Specifically, a report titled "Implications of Residual Fuel Oil Phase Out," given out as part of a presentation at the 37th Annual International Association for Energy Economics ("IAEE") Conference conducted June 15-18, 2014, held similar findings.  The IAEE report stated that "[b]y 2020, the International Convention for Prevention of Pollution from Ships (MARPOL), adopted by the International Maritime Organization (IMO), will mandate that no marine vessel will be allowed to consume fuel with sulfur content greater than 0.1%."  With residual fuel oils containing more than 3% sulfur, the report found that "residual fuel oil may very well be phased out of the markets."

48.    Further, the U.S. Energy Information Administration ("USEIA") released a report on October 9, 2015 titled "With Increased Regulation, Continued Decline in Residual Fuel Oil Demand is Expected" that highlighted decades of declining use of residual fuel oils.  The USEIA report contemplated a continued decline in their use resulting from decreased use in power generation and space heating, as well as in the maritime sector where it is used.  In thousands of barrels per day, the consumption of residual fuel oil in the U.S. has correspondingly slid significantly from 2000 to 2017, as the USEIA chart below demonstrates:



**IMPROPER STATEMENTS**

49.     As detailed below, between at least February 2016 and November 2017, the Individual Defendants repeatedly boasted that the Company was experiencing purportedly "very stable" utilization rates in the high 90% range and "very strong" operational performance in its IMTT segment.  As the Company ultimately admitted, all of these statements were woefully inaccurate when made.   In reality, IMTT was experiencing high risk associated with its utilization rates due to a significant decline in the market demand for heavy residual oils the Company stores, requiring significant capital to repurpose its IMTT storage tanks.

50.     On February 22, 2016, the Company issued a press release announcing its financial and operational results for the fourth quarter and fiscal year of 2015.  The February 22, 2016 press release reported a dividend of $1.15 per share for the fourth quarter.  Noting the importance of dividends to stockholders, the Company stated that it had increased its cash dividend in each of the last nine quarters, with total dividends increasing 14.7% in 2015 compared to 2014.

51.     In the February 22, 2016 press release, defendant Hooke, Macquarie's then-CEO, touted the growth in the free cash flow generated from the Company's business, stating that "growth has been achieved despite the volatility in markets broadly and reinforces a basic premise of infrastructure – namely, that it is an inherently more stable asset class." Particularly, defendant Hooke highlighted the Company's IMTT segment and its supposed strength. Defendant Hooke asserted that "[t]he performance of IMTT in both the quarter and the full year periods reflects the downstream services nature of the business overall, as well as the extent to which it is uncorrelated with the exploration and production (E&P) portion of the oil industry," with the segment showing "no signs of counter-party distress during 2015." The supposed strength of the IMTT segment was the result of "improvements in firm commitments including increased utilization rates of 94.9% at year end of 2015."

52.     The following day, on February 23, 2016, the Company filed its Annual Report on Form 10-K with the SEC (the "2015 Form 10-K") discussing the financial and operating results for the fourth quarter and fiscal year ended December 31, 2015. Defendants Hooke, Stewart, Stanley, Brown, Carmany, Webb, Lentz, and Sananikone signed the 2015 Form 10-K. For 2015, the Company reported a total revenue of $1.6 billion and a net loss of $113.8 million for the entire Company, with the IMTT segment bringing in almost a third of the total revenue at $550 million and a net income of $74.1 million. Defendants Hooke, Stewart, Stanley, Brown, Carmany, Webb, Lentz, and Sananikone caused or allowed the Company to downplay the potential risk of reduction in utilization rates for its IMTT segment. In particular, the 2015 Form 10-K stated that while uncertainty had led to a reduction in the average duration of storage and related services contracts, as well as the potential shortening of contracts, "the essential services nature of the business and continued strong demand for the products stored serves to offset this

risk."  To further mitigate the risk, the 2015 Form 10-K assured investors that "IMTT does not depend on a single customer, the loss of which would have a material adverse effect on IMTT."

53.     The 2015 Form 10-K contained certifications by defendants Hooke and Stewart pursuant to sections 302 and 906 of Sarbanes-Oxley Act of 2002 ("SOX") that the Annual Report fully complied with the requirements of Section 13(a) or Section 15(d) of the Exchange Act.  Defendants Hooke and Stewart further certified that the report did not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

54.     Also on February 23, 2016, the Company held a conference call with analysts and investors to discuss the financial reporting in the 2015 Form 10-K.  During the call, defendant Hooke emphasized the stability of IMTT utilization rates, which he boasted were high and bolstered against market fluctuations in the petroleum market.  Defendant Hooke assured the attendants that "utilization remains high, firm commitments are up, and the cold snap in the Northeast, short-lived though it was, was a mild positive from a heating revenue point of view." Defendant Hooke continued, "[t]his is not a business that is sensitive to what is going on in the exploration and production, or in interstate product movement..." rather "a business that has some sensitivity to enduser demand, but least in the petroleum segment of its operations."  He touted that IMTT experienced "growth in end user demand."  With the purported growth in demand, defendant Hooke stated that "IMTT is likely to continue to perform well and continue to serve as a platform for capital deployment."

55.     On May 12, 2016, the Company held an Investor Day conference, where defendant Courtney, IMTT's CEO, boasted about the supposed stability of IMTT's utilization

rates.  Defendant Courtney assured investors that any changes in demand for heavy residual oils would not affect the Company's downstream storage services, stating that: "Most of the problems that are happening right now is affecting the upstream, crude, exploration and the gathering.  For us, we are kind of downstream.  Our assets are in a different part of the logistics and distribution chain."

56.     On August 30, 2016, the Company participated in the Three Part Advisors Midwest IDEAS Investor Conference ("TPAM").  In presenting the Company's IMTT segment, defendant Davis assured investors that IMTT "is a downstream business, we are dealing in refined products and demand for refined products has likely been quite strong.  So this business has performed well throughout this period of time."  Touting utilization rates between 94% to 96% as "normal" for the Company, defendant Davis stated that "[d]emand for storage is high ... as it pertains to refined product."

57.     On February 21, 2017, the Company filed its Annual Report on Form 10-K with the SEC (the "2016 Form 10-K") discussing the financial and operating results for the fourth quarter and fiscal year ended December 31, 2016.  Defendants Hooke, Stewart, Choi, Stanley, Brown, Carmany, Kirk, Lentz, and Sananikone signed the 2016 Form 10-K.  For 2016, the Company reported a total revenue of $1.6 billion and a net income of $154 million for the entire Company, with IMTT again accounting for approximately a third of the total revenue at $532.5 million and more than half of the Company's net income at $83.1 million.  In the 2016 Form 10-K, the Company also reassured the investing public that "IMTT does not depend on a single customer, the loss of which would have a material adverse effect on IMTT."  Instead, the Company asserted that its IMTT customer contracts were strong, with "investment grade" clients operating under "fixed period payment" contracts.  The 2016 Form 10-K stated:

For the year ended December 31, 2016, approximately 55% of IMTT's revenue was generated by its top ten customers of which seven were rated as investment grade and the other three were not rated.  Customers typically sign contracts which, among other things, provide for a fixed periodic payment (usually monthly) for access to and use of IMTT's facilities.  This payment may be expressed in terms of cents per barrel of storage capacity, a dollar amount per unit of infrastructure, or a dollar amount per month.  These amounts are payable whether the customer uses the facilities or not.

58.     The 2016 Form 10-K further purported that the Company was not exposed to market fluctuations in the underlying commodities market, despite IMTT servicing customers' commodities in its facilities.  The Company stated in the 2016 Form 10-K that "IMTT does not have material exposure to commodity price fluctuations because it typically does not purchase or market the products that it handles."

59.     The 2016 Form 10-K contained certifications by defendants Hooke and Stewart, Macquarie's CEO and CFO respectively, pursuant to sections 302 and 906 of SOX that the Annual Report fully complied with the requirements of Section 13(a) or Section 15(d) of the Exchange Act.  Defendants Hooke and Stewart further certified that the report did not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

60.     On February 22, 2017, following the filing of the 2016 Form 10-K, the Company held a conference call with analysts and investors to discuss the financial results for fiscal year 2016.  During the conference call, defendant Hooke claimed that IMTT's utilization rates and stability throughout the period remained stable, as "utilization remained very strong" and "[s]torage prices were stable, with pricing on renewal stepping up in line with inflation." Defendant Hooke continued to assure investors that overall "[u]tilization [in IMTT] remained at the high end of historically normal levels at 96.4% at year end."

61.     During the February 22, 2017 conference call, defendant Hooke also discussed the Company's ability to weather demand fluctuations in the underlying petroleum market. Defendant Hooke stated that IMTT pricing expectations and negotiations for the asset "will revert to historically normal levels [of utilization] ... because things generally revert to historically normal levels."  Stating that "[t]here's nothing we see coming down the pipe that says that this is why we'll revert to historically normal levels," defendant Hooke assured investors that the Company had "every incentive to keep those tanks as full as we can, and we will."

62.     On May 10, 2017, at the Oppenheimer Industrial Growth Conference, defendant Davis touted that IMTT "utilization rates are at very high levels."  According to defendant Davis, utilization rates would remain high into 2018 due to "the basic services nature of this business – its capital intensity and very high barrier to entry into this business – provide us with good visibility into its cash generation and opportunities for growth over time."

63.     On May 18, 2017, defendant Davis attended the TPAM, where he again claimed that "utilization rates have remained very, very high, and they're currently over 96%, which is to say we don't have space for anything else at this point in time."  Defendant Davis further avowed that the Company had its fingers on the pulse of the industry, including "macroeconomic factors influencing supply and demand more broadly."  He affirmed the Company's ability to maintain high utilization rates through 2018 as "the basic services nature of the business gives us good visibility."  In terms of risk, defendant Davis stated that IMTT facilities had "no commodity exposure directly" as the Company "simply provides access to storage capacity."

64.     On June 27, 2017, the Company participated in the JPMorgan Energy Equity Investor Conference.  Defendant Stewart purported to investors present that "utilization for [IMTT] remains at the high end of historical range."  He claimed that IMTT benefited from

"stable, generally growing demand and typically very favorable competitive dynamics." Defendant Stewart attributed the reported success of IMTT to "[t]he effective execution of this strategy" that "led to attractive levels of growth in cash generation, dividends, and the MIC share price." Extoling the Company's metrics, defendant Stewart stated that "[e]ach of free cash flow and dividends have grown at a mid-teens pace over the past five years."

65.     On August 3, 2017, the Company held a conference call with analysts and investors, covering the Company's financial and operating results for the second quarter of 2017. In responding to an analysts question regarding fluctuations in the petroleum market causing a corresponding decline in utilization rates, defendant Hooke attributed any changes in utilization as "driven by tanks offline for tank cleaning and inspection," and not "commodity noise or other noise or counter-party issues there." Defendant Hooke affirmed that "IMTT's operating results for the second quarter were a case of steady as she goes, a reversion to the mean in storage utilization, stable pricing and one small construction project termination that resulted in recognition of some deferred revenue."

66.     On August 31, 2017, the Company participated in the TPAM. During the conference, defendant Davis reiterated that "utilization has been very, very stable" with 94% utilization "consistent with historically normal" levels. Regarding the Company's dividend, defendant Davis stated that "what you've got there is a stable and growing cash generation from some very basic services kind of businesses where we're being traded today, of course, I think most people would suggest is an attractive yield leading to that mid- to high-teens kind of a total opportunity – total return kind of an opportunity, very much consistent with what we've been doing for the past 13 years."

67.     On November 1, 2017, the Company filed its Quarterly Report on Form 10-Q with the SEC discussing the financial and operating results for the third quarter ended September 30, 2017 (the "Q3 2017 Form 10-Q").  Defendants Hooke and Stewart signed the Q3 2017 Form 10-Q.  For the third quarter, the Company reported a quarterly dividend of $1.42 per share, a 10% increase over the dividend provided during the same period in the previous year.  During the quarter, total revenue was $453 million and net income was $36 million for the entire Company, with IMTT compromising $134 million of that revenue, and $20 million of the overall net income.  The Q3 2017 Form 10-Q maintained that the Company expected high utilization rates of "94% over the long term, as they have been historically."

68.     The Q3 2017 Form 10-Q contained certifications by defendants Hooke and Stewart pursuant to sections 302 and 906 of SOX that the Quarterly Report fully complied with the requirements of Section 13(a) or Section 15(d) of the Exchange Act.  Defendants Hooke and Stewart further certified that the report did not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

69.     The following day, on November 2, 2017, the Company held a conference call with analysts and investors discussing the financial and operating results in the Q3 2017 Form 10-Q.  During the conference call, defendant Hooke attributed a slight drop in IMTT utilization in the third quarter to out-of-service tanks for a portion of the period, and assured investors that "the decline in utilization was not outside the historically normal utilization range of between 92% and 94%."

70.    During the November 2, 2017 conference call, defendant Hooke also made guarantees regarding the Company's supposedly consistent dividend policy.  Defendant Hooke stated that "across the period I've been here, you've never seen us make radical lurching changes of ... revisiting capital policy and dividend policy."  Defendant Hooke expressed that he "would be pretty surprised if anything changes going forward."  He further pledged that the Company was not influenced by new practices in the industry to deemphasize dividends, stating:

> I don't think you'll see us imitate too many others over time.  I think our view is fads come and go as to what's popular. Exuberant dividend growth at all costs where people were urging us to guide to 7 years' visibility of 20% plus dividend growth, we never did that.  People slashing their dividend saying we're going to slash our dividend to deploy capital internally, I don't think you'll see us do that.  I don't think we will get into any of those fads.  I would say that some of the midstream firms are sort of having to take, today, some pain for some decisions they've taken in the past that we haven't taken. Remember that sort of 60% of our business or so is not midstream.

71.    On November 16, 2017, the Company participated in the TPAS, which defendant Davis attended.  During the conference, defendant Davis assured investors that utilization rates would remain stable because the Company had "very good visibility into the cash generating capacity of this business over a longer period of time."  Regarding the Company's dividend, defendant Davis attested that the Company provides "pretty consistent increases in the dividend" which he stated was "between 75% and 85% of the cash produced."

### THE FALSE AND MISLEADING 2016 PROXY STATEMENT

72.    On April 1, 2016, defendants Stanley, Brown, Carmany, Lentz, Sananikone, and Webb caused Macquarie to file with the SEC its 2016 Proxy Statement on Form DEF 14A in connection with its 2016 Annual Meeting of Shareholders, held on May 18, 2016.  Defendants Stanley, Brown, Carmany, Lentz, Sananikone, and Webb negligently issued materially misleading statements with respect to solicited votes as described herein.  Plaintiff's allegations with respect to the misleading statements in the 2016 Proxy are based solely on negligence; they

are not based on any allegation of reckless or knowing conduct by or on behalf of these defendants, and they do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

**Material Misstatements in Support of a Vote to Approve the 2016 Omnibus Employee Incentive Plan**

73.     Defendants Stanley, Brown, Carmany, Lentz, Sananikone, and Webb made material misrepresentations in the 2016 Proxy in support of a stockholder vote for approval of the 2016 Omnibus Employee Incentive Plan (the "Incentive Plan").  The Incentive Plan sought the issuance of equity-based awards covering up to 500,000 shares of Macquarie's common stock.  The annual and long-term compensation awards were subject to performance goals with the purported purpose "to attract, retain and motivate employees (including prospective employees), consultants and others who may perform services for the Company or its subsidiaries, to compensate them for their contributions to our long-term growth and profits and to encourage them to acquire a proprietary interest in the success of the Company."

74.     The material terms of the performance goals in Macquarie's Incentive Plan did not encourage Macquarie executives to promote the success of Macquarie.  Among the listed performance goals, the Board endorsed targeted levels of asset quality, operating efficiency, enterprise value, cash flow, free cash flow, operating cash flow, and dividend yield, subjects of the Company's misstatements.  Particularly, the Incentive Plan incentivized the concealment of the loss of several contracts at the Company's flagship storage facility, due to a decline in the IMTT segment, which caused the Company to slash dividends to improve balance sheet metrics.  Defendants knew or should have known that company executives had breached their fiduciary

duties to the Company and exposed it to significant and material risks and liability through their conduct related to statements regarding the Company's IMTT segment and dividend.

75.     Under this false impression, numerous Macquarie stockholders voted for the reservation of equity awards for distribution under the Incentive Plan.  This vote was made without the benefit of material information regarding the defendants' continued and ongoing failure to address improper statements regarding the Company's operations and dividend policy. In reality, the Incentive Plan only incentivized the continued risk-taking and illegal corporate action described herein.  The proxy solicitation for a stockholder vote on the material terms of the performance goals in Macquarie's Incentive Plan directly authorized harm to the stockholders.  Therefore, the 2016 Proxy was an "essential link" in the accomplishment of the harm-causing conduct.

## THE TRUTH EMERGES

76.     Given the Individual Defendants' material misstatements, it came as a shock to the stock market on February 21, 2018, when Macquarie announced in an after-hours press release that the Company had fallen well short of its expectations.  In a February 21, 2018 press release, Macquarie engaged in 'kitchen-sinking,' revealing all at once the developments it had been concealing, including lower than expected 2018 guidance, a dividend cut, repurposing of its IMTT tanks, and the need to conduct a strategic review of the Company's IMTT segment.  In particular, IMTT utilization plummeted due to a shifting storage environment, declining to 90% in the fourth quarter of 2017, which was well below the historical average Defendants had led investors to believe would continue.  Macquarie attributed the sharp decline to the loss of contracts for residual and heavy oil storage amid changes in product demand for Number 6 fuel oil and market conditions.  To redeploy the storage tanks left vacant due to these contract losses,

the Company announced that it needed to repurpose many of the tanks to accommodate more attractive products.  The Company later revealed that it would need to invest $75 million a year in part to repurpose tanks to store liquids other than residual fuel oils marked for higher regulation, like Number 6 fuel oil.

77.     Macquarie further announced on February 21, 2018 that its 2018 guidance would be well below expectations and the dividends reduced.  The Company now reported earnings before interest, taxes, depreciation, and amortization ("EBITDA") as $690 million to $720 million, well below the approximately $800 million analysts like J.P. Morgan were led to expect.  The Company attributed this guidance decline to IMTT weakness and the repurposing of tankage.  Additionally, year-over-year free cash flow fell from 10-15% to 8-10%.  Dividend guidance also suffered as a result of the deterioration of the Company's IMTT segment, with 2018 guidance altered dramatically to just $1 per share per quarter, representing a 31% cut from previous guidance.  The Company cited the need for increased internal funding for the IMTT tank repurposing in the wake of weakened demand for the Company's services.

78.     In the wake of the Company's revelations, analysts noted how the news had shocked the stock market given the Individual Defendants' prior assurances.  Discussing J.P. Morgan's decision to downgrade Macquarie to a "Neutral Rating" due to the weaker-than-expected 2018 EBITDA guidance, analysts at the firm stated "[t]he rapid decline comes as a surprise given [management's] prior steadfast commentary on the strength of the [IMTT] business given strong competitive positioning" in the regions where the Company operates.  Further, expressing dismay regarding the dividend cut, analysts at J.P. Morgan asserted "the magnitude of the cut surprises us and will likely lead to some rotation by income investors" that depend on the Company's assurances regarding a consistent dividend.

79.     On this news, Macquarie's market capitalization plunged more than 41%, or $26.21 per share, on February 22, 2018, to close at $37.41 per share compared to the previous trading day's closing of $63.62 per share, erasing more than $2.2 billion in market capitalization in a single day.

## REASONS THE STATEMENTS WERE IMPROPER

80.     The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing that:

(a)     Macquarie was experiencing known but undisclosed risks to its IMTT's operational performance and tank utilization due to well-known market changes affecting demand for heavy residual oils, including Number 6 fuel oil;

(b)     the Company's operational performance was dependent on demand for storage of heavy residual fuel oils to maintain its contracts in the IMTT segment;

(c)     the Company needed to repurpose its IMTT storage tanks as a result of this decline in demand, requiring significant capital expenditure affecting the Company's ability to pay dividends as warranted; and

(d)     as a result of the foregoing, the officers' and directors' representations concerning the Company's business, prospects, and financial standing were improper.

## DAMAGES TO MACQUARIE

81.     As a result of the Individual Defendants' improprieties, Macquarie disseminated improper, public statements concerning the Company's IMTT segment's operational performance and its ability to provide a dividend as warranted.  These improper statements have devastated

Macquarie's credibility as reflected by Macquarie's more than $2.2 billion, or 41%, market capitalization loss.

82.     The Individual Defendants' unlawful course of conduct has also subjected the Company to potentially hundreds of millions of dollars in damages in connection with the class actions for violations of federal securities laws.  The Securities Class Actions allege that the Company and certain individual defendants violated securities laws by repeatedly misrepresenting that the Company had stable utilization rates in its IMTT segment and promised consistent dividends throughout 2018.

83.     Macquarie's performance issues also damaged its reputation within the business community and in the capital markets.  In addition to price, Macquarie's current and potential customers consider Macquarie's ability to accurately value its business prospects in its largest and most profitable segment, and evaluate demand and associated risks inherent in the underlying commodities markets that the Company services.  Macquarie's customers are less likely to award contracts to the Company if the Company is unable to timely repurpose its storage tanks in response to the prevailing market demand.  Further, investors are less likely to invest in companies that disseminate improper statements and are uncertain about their own financial conditions.  In the wake of the revelation that the Company failed to account for declining demand for its IMTT services, Macquarie's ability to raise equity capital or debt, on favorable terms in the future is now impaired.  In addition, Macquarie stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to Macquarie.

84.     Further, as a direct and proximate result of the Individual Defendants' actions, Macquarie has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

(a)     costs incurred from defending and paying any settlement in the class actions for violations of federal securities laws;

(b)     costs incurred to investigate wrongdoing;

(c)     costs incurred from granting compensation pursuant to the  Incentive Plan that was approved via the misleading 2016 Proxy; and

(d)     costs incurred from compensation and benefits paid to the defendants who have breached their duties to Macquarie.

## <u>DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS</u>

85.     Plaintiff brings this action derivatively in the right and for the benefit of Macquarie to redress injuries suffered, and to be suffered, by Macquarie as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  Macquarie is named as a nominal defendant in this action solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

86.     Plaintiff will adequately and fairly represent the interests of Macquarie in enforcing and prosecuting its rights.

87.     Plaintiff was a stockholder of Macquarie at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Macquarie stockholder.

88.    The current Board of Macquarie consists of the following seven individuals: defendants Stanley, Brown, Carmany, Hooke, Kirk, Lentz, and Sananikone.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because Defendants Stanley, Brown, Carmany, Hooke, Kirk, Lentz, and Sananikone Face a Substantial Likelihood of Liability for Their Misconduct**

89.    Defendants Stanley, Brown, Carmany, Lentz, and Sananikone are responsible for statements which were negligently made in the materially misleading 2016 Proxy.  It is against public policy to indemnify individuals for violations of section 14(a) of the Exchange Act. Accordingly, an indemnification provided by the Company to defendants Stanley, Brown, Carmany, Lentz, and Sananikone does not protect them for violation of section 14(a) in the 2016 Proxy.   Accordingly, defendants Stanley, Brown, Carmany, Lentz, and Sananikone face substantial likelihood of liability, excusing demand.

90.    Additionally, defendants Stanley, Brown, Carmany, Hooke, Kirk, Lentz, and Sananikone further breached their fiduciary duties of loyalty by making improper statements in Macquarie's SEC filings.   Defendants Stanley, Brown, Carmany, Hooke, Kirk, Lentz, and Sananikone signed the Company's 2015 and/or 2016 Forms 10-K, which incorrectly stated that the Company had stable utilization rates in its IMTT segment and promised consistent dividends throughout 2018.   These statements were improper because they knowingly or recklessly misstated and/or omitted material, adverse facts concerning risks to IMTT's operational performance and tank utilization due to well-known market changes affecting demand for heavy residual oils, including Number 6 fuel oil.  The Company has already admitted that these statements were not true when made, and required the Company to make significant cuts to its dividend guidance for 2018.

91.     Defendants Brown, Carmany, Kirk, Lentz, and Sananikone, as members of the Audit Committee, reviewed and approved the improper statements and earnings guidance.  The Audit Committee's Charter provides that members are responsible for compliance with accounting, legal, and regulatory requirements.  Thus, the Audit Committee Defendants were responsible for knowingly or recklessly allowing the improper statements related to Macquarie's IMTT utilization rates and dividend policy.  Despite their knowledge or reckless disregard, the Audit Committee Defendants caused these improper statements.  Accordingly, the Audit Committee Defendants breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein.  Thus, the Audit Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties so any demand made upon them is futile.

**Demand Is Excused as to Defendants Stanley, Hooke, and Sananikone for Additional Reasons**

92.     The principal professional occupation of defendant Stanley is his employment as the Global Head of Macquarie Infrastructure and Real Assets ("MIRA"), a division of Macquarie Asset Management, a part of the Macquarie Group.  The Company's manager in the U.S., Macquarie Infrastructure Management (USA) Inc. (the "Manager"), elected defendant Stanley to the Board as the sole holder of Macquarie's special stock.  On information and belief, defendant Stanley has received and continues to receive substantial compensation and other benefits due to his employment with the Macquarie Group.  Further, as the Company admits in its Proxy Statement on Form DEF 14A filed with the SEC on March 29, 2018 ("2018 Proxy"), defendant Stanley is not considered an independent director under the applicable standards of the SEC, and New York Stock Exchange ("NYSE") marketplace rules due to his relationship with the Company and the Macquarie Group.  There is reason to doubt defendant Stanley will vote to

initiate litigation in light of the significant financial and reputational damage that it will bring to his colleagues employed through Macquarie Group, including defendants Stewart, Davis, Courtney, and Hooke and defendant Stanley's employer, the Manager and the Macquarie Group. Defendant Stanley also has an interest in maintaining his principal occupation and substantial compensation he receives in connection with his principal occupation at MIRA, a division of the Macquarie Group and/or its subsidiaries or affiliates.   This lack of independence renders defendant Stanley incapable of impartially considering a demand to commence and vigorously prosecute this action.

93.     The principal professional occupation of defendant Hooke during the relevant period was his employment with Macquarie as CEO, pursuant to which he has received substantial monetary compensation and other benefits as alleged above.   According to the Company, defendant Hooke remains an employee of the Macquarie Group, through an employment agreement with Macquarie Corporate Holdings Limited executed in March 2015, and he was elected in September 2017 by the Board to fill a vacancy created when the Board expanded from six to seven members.   Further, as the Company admits in its 2018 Proxy, defendant Hooke is not considered an independent director under the applicable standards of the SEC and NYSE marketplace rules due to his relationship with Macquarie.   Accordingly, defendant Hooke lacks independence from the remaining Board members, defendants Stanley, Brown, Carmany, Kirk, Lentz, and Sananikone, who face a substantial likelihood of liability, due to his interest in maintaining his employment with the Macquarie Group.   This lack of independence renders defendant Hooke incapable of impartially considering a demand to commence and vigorously prosecute this action.

- 37 -

94.     Defendant Sananikone, a professional board member, has served on the boards of several companies affiliated with the Macquarie Group.  In particular, defendant Sananikone currently serves as a director for Icon Parking Systems, LLC, acquired by Macquarie Bank Limited and affiliated with Macquarie Group.  She previously served as Chairman of Smarte Carte and was a director of both Moto Hospitality Services and Air-Serv Holdings, companies that are or were owned by Macquarie investment consortiums, and managed as Macquarie Group affiliates.  Defendant Sananikone will not vote to initiate litigation and give up serving on future boards of the Macquarie Group, and the substantial compensation and prestige which comes from serving on those boards.

95.     Plaintiff has not made any demand on the other stockholders of Macquarie to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)     Macquarie is a publicly held company with over 85.3 million shares outstanding and thousands of stockholders as of July 31, 2018;

(b)     making demand on such a large number of stockholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of Company stockholders; and

(c)     making demand on all stockholders would force plaintiff to incur excessive expenses, assuming all stockholders could be individually identified.

## COUNT I

### Against Defendants Stanley, Brown, Carmany, Lentz, Sananikone, and Webb
### for Violation of Section 14(a) of the Exchange Act

96.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

97.     The section 14(a) Exchange Act claims alleged herein are based solely on negligence.  They are not based on any allegation of reckless or knowing conduct by or on behalf of defendants Stanley, Brown, Carmany, Lentz, Sananikone, and Webb.  The section 14(a) claims alleged herein do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

98.     Defendants Stanley, Brown, Carmany, Lentz, Sananikone, and Webb negligently issued, caused to be issued, and participated in the issuance of materially false and misleading written statements to Company stockholders that were contained in the 2016 Proxy.  The 2016 Proxy contained proposals to the Company's stockholders that they vote to approve the Company's Incentive Plan.  By reasons of the conduct alleged herein, defendants Stanley, Brown, Carmany, Lentz, Sananikone, and Webb violated section 14(a) of the Exchange Act.  As a direct and proximate result of these violations, stockholders voted in favor for the reservation of equity awards under the Incentive Plan, including 500,000 shares of Macquarie's common stock.  Defendants Stanley, Brown, Carmany, Lentz, Sananikone, and Webb's incentives approved under the Incentive Plan led to the continuation of the wrongful practices described herein.

99.     Plaintiff, on behalf of Macquarie, thereby seeks relief for damages inflicted upon the Company in connection with the approval of the Incentive Plan based upon the false and misleading 2016 Proxy, and seeks a new vote on the basis of a special proxy with appropriate corrective disclosures.

## COUNT II

### Against the Individual Defendants for Breach of Fiduciary Duties

100.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

101.    The Individual Defendants owed and owe Macquarie fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Macquarie the highest obligation of good faith, fair dealing, loyalty, and due care.

102.    The Individual Defendants and each of them violated and breached their fiduciary duties of candor, good faith, and loyalty.  More specifically, the Individual Defendants violated their duty of good faith by creating a culture of lawlessness within Macquarie, and/or consciously failing to prevent Macquarie from engaging in the unlawful acts complained of herein.

103.    The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.  The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing that: (i) Macquarie was experiencing known but undisclosed risks to its IMTT's operational performance and tank utilization due to well-known market changes affecting demand for heavy residual oils, including Number 6 fuel oil; (ii) the Company's operational performance was dependent on demand for storage of heavy residual fuel oils to maintain its contracts in the IMTT segment; and (iii) the Company needed to repurpose its IMTT storage tanks as a result of this decline in demand, requiring significant capital expenditure affecting the Company's ability to pay dividends as warranted.  Accordingly, the Officer Defendants breached their duty of loyalty to Macquarie.

104.    The Director Defendants, as directors of Macquarie, owed Macquarie the highest duty of loyalty.  These defendants breached their duty of loyalty by recklessly permitting the Company to issue improper statements.  The Director Defendants knew or were reckless in not knowing that: (i) Macquarie was experiencing known but undisclosed risks to its IMTT's operational performance and tank utilization due to well-known market changes affecting demand for heavy residual oils, including Number 6 fuel oil; (ii) the Company's operational performance was dependent on demand for storage of heavy residual fuel oils to maintain its contracts in the IMTT segment; and (iii) the Company needed to repurpose its IMTT storage tanks as a result of this decline in demand, requiring significant capital expenditure affecting the Company's ability to pay dividends as warranted.  Accordingly, the Director Defendants breached their duty of loyalty to Macquarie.

105.    The Audit Committee Defendants, breached their fiduciary duty of loyalty by approving the statements described herein, which were made during their tenure on the Audit Committee, which they knew, or were reckless in not knowing, contained improper statements and omissions.  The Audit Committee Defendants completely and utterly failed in their duty of oversight, and failed in their duty to appropriately review financial results, as required by the Audit Committee Charter which was in effect at the time.

106.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Macquarie has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to Macquarie.

107.    Plaintiff, on behalf of Macquarie, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Waste of Corporate Assets

108.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

109.    As a result of the misconduct described herein, the Individual Defendants have wasted corporate assets by forcing the Company to expend valuable resources in defending itself in the Securities Class Actions.  In addition, Macquarie faces potential liability for any costs from a potential settlement or adverse judgment in the litigations.

110.    Further, by failing to conduct proper supervision, the Individual Defendants have caused Macquarie to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors who breached their fiduciary duty.

111.    As a result of the waste of corporate assets, the Individual Defendants are liable to Macquarie.

112.    Plaintiff, on behalf of Macquarie, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Unjust Enrichment

113.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

114.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Macquarie.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Macquarie.

115.     Plaintiff, as a stockholder and representative of Macquarie, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

116.     Plaintiff, on behalf of Macquarie, has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Macquarie, demands judgment as follows:

A.       Against all of the defendants and in favor of Macquarie for the amount of damages sustained by Macquarie as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.       Directing Macquarie to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws, and to protect Macquarie and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for a stockholder vote, resolutions for amendments to Macquarie's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following Corporate Governance Policies:

1.       a proposal to ensure proper oversight of the Company's market risks;

2.       a proposal to strengthen Macquarie's internal controls over financial reporting;

3.       a proposal to strengthen Macquarie's oversight of its disclosure procedures to ensure material information is adequately and timely disclosed to the SEC and the public, including in the Company's proxy statements;

4.    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board; and

5.    a provision to permit the stockholders of Macquarie to nominate at least three candidates for election to the Board.

C.    Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Macquarie has an effective remedy;

D.    Awarding to Macquarie restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

E.    Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.    Granting such other and further relief as the Court deems just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury.

Dated: August 9, 2018

LAW OFFICE OF THOMAS G. AMON

THOMAS G. AMON

733 3rd Avenue, 15th Floor
New York, NY 10017
Telephone: (212) 810-2430
E-mail: tamon@amonlaw.com

ROBBINS ARROYO LLP
BRIAN J. ROBBINS
KEVIN A. SEELY
LINDSEY C. HERZIK
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsarroyo.com
        kseely@robbinsarroyo.com
        lherzik@robbinsarroyo.com

Attorneys for Plaintiff

1283049

VERIFICATION

I, Phyllis Wright, hereby declare as follows:

I am the plaintiff in the within entitled action.  I have read the Verified Stockholder Derivative Complaint for Violation of Securities Law, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment.  Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: _August 8, 2018_

_____
PHYLLIS WRIGHT